## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL FEDERATION OF FEDERAL        :
EMPLOYEES, FD1, IAMAW, AFL–CIO,       :
                                      :
    Plaintiff,              :        Civil Action No.:      14-00960 (RC)
                                      :
v.                                    :        Re Document Nos.:    10, 12
                                      :
ROBERT MCDONALD, *in his official capacity* :
    *as Acting Secretary of Veterans Affairs*,  :
                                      :
    Defendant.              :

## MEMORANDUM OPINION

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Although registered nurses employed by the Department of Veterans Affairs generally enjoy collective bargaining rights, these rights are limited by the Secretary of Veterans Affairs' authority under 38 U.S.C. § 7422 to determine that certain demands are not subject to bargaining because they implicate "professional conduct or competence"— defined to encompass "direct patient care."  In the instant case, after a VA hospital in Texas faced with staffing shortages decided to implement mandatory overtime for registered nurses, the nurses' union sought to bargain about certain procedures governing the overtime measures.  The hospital refused to bargain, and the Secretary ultimately sided with the hospital, finding that the union's proposals concerned "direct patient care" within the meaning of § 7422.  The union brought this action under the Administrative Procedure Act challenging the Secretary's § 7422 decision, and the parties have filed cross-motions for summary judgment.  The Court concludes that because the § 7422 decision does not reflect reasoned decisionmaking, it is arbitrary and capricious.

Accordingly, the Court grants the union's motion for summary judgment, vacates the § 7422 decision, and remands the matter to the Acting Secretary for further proceedings.

## II.  BACKGROUND

### A.  Statutory Framework

In 1978, Congress extended collective bargaining rights to federal employees as part of the Civil Service Reform Act ("CSRA").  *See* CSRA of 1978, Pub. L. No. 95–454, title VII, § 701, 92 Stat. 1111, 1192 (1978), *codified at* 5 U.S.C. § 7102(2).  In provisions now codified in chapter 71 of title 5 of the United States Code, the CSRA prohibits various "unfair labor practices" that interfere with those collective bargaining rights, 5 U.S.C. § 7116, and delegates enforcement to the Federal Labor Relations Authority ("FLRA"), *see id.* §§ 7104–05, 7118.  The General Counsel of the FLRA, upon investigation of an alleged unfair labor practice, may issue a complaint against the relevant agency or labor organization.  *See id.* § 7118(a)(1).  Thereafter, the FLRA must conduct a hearing on the complaint, *see id.* § 7118(a)(6), and, if it finds that an unfair labor practice occurred, issue a written decision awarding appropriate relief, *see id.* § 7118(a)(7).

Congress subsequently decided to clarify and calibrate the collective bargaining rights of certain healthcare professionals employed by the Department of Veterans Affairs ("VA"), following the D.C. Circuit's determination that the existing statutory framework did not provide for such rights.  *See Am. Fed'n of Gov't Emps., AFL–CIO Local 2152 v. Principi*, 464 F.3d 1049, 1051 (9th Cir. 2006) (explaining Congress's concerns in the wake of *Colorado Nurses Association v. FLRA*, 851 F.2d 1486 (D.C. Cir. 1988)).  To this end, Congress enacted the Department of Veterans Affairs Labor Relations Improvement Act of 1991.  *See* Pub. L. No. 102–40, title II, § 202, 105 Stat. 187, 200 (1991), *codified at* 38 U.S.C. §§ 7421 *et seq*.  The Act

authorizes the Secretary of Veterans Affairs to "prescribe by regulation the hours and conditions

of employment and leaves of absences" of specific classes of VA employees, 38 U.S.C. §

7421(a), (b), but also provides that this general authority is "subject to" the collective bargaining

rights of those employees, as provided in chapter 71 of title 5 of the United States Code, *id.* §

7422(a).

The Act goes on, however, to establish three limitations on the scope of VA healthcare

professionals' collective bargaining rights.  As codified at subsection (b) of § 7422, the Act

provides that collective bargaining involving covered employees

> may not cover, or have any applicability to, any matter or question
> concerning or arising out of (1) professional conduct or
> competence, (2) peer review, or (3) the establishment,
> determination, or adjustment of employee compensation under this
> title.

*Id.* § 7422(b).  Subsection (c) explains that "[f]or purposes of this section, the term 'professional

conduct or competence' means any of the following:  (1) Direct patient care.  (2) Clinical

competence."  *Id.* § 7422(c).  Subsection (d) provides that the applicability of the subsection (b)

limitations in any given case "shall be decided by the Secretary and is not itself subject to

collective bargaining."  *Id.* § 7422(d).  These decisions are reviewable in the first instance by

federal district courts.  *See Am. Fed'n of Gov't Emps., AFL–CIO, Local 446 v. Nicholson*, 475

F.3d 341, 348–50 (D.C. Cir. 2007) ("*AFGE Local 446*") (holding that the district court had

subject-matter jurisdiction under 28 U.S.C. § 1331 over a challenge to a § 7422 decision).

### B.  Factual Background

In September 2012, the Thomas E. Creek VA Medical Center in Amarillo, Texas

("Amarillo VAMC" or "Medical Center"), began experiencing staffing shortages in one of its

units.  *See* A12.  Eventually, the number of registered nurses in the unit dropped 24 percent, from

twenty-one to sixteen. *Id.*; *see also* A5. After various efforts to ameliorate the shortage proved unsuccessful, the Medical Center decided in late November 2012 to mandate overtime for all registered nurses covered by title 38. *See* A12–13. The mandatory overtime spanned three pay periods from December 2012 to January 2013; all nurses were required to work one additional twelve-hour shift during each pay period. *See id.* On November 29, 2012, the Nurse Executive met with the National Federation of Federal Employees ("the Union"), which represented the affected nurses, to explain the mandatory overtime requirement. *See id.*[1]

In December 2012, the Union made several attempts to bargain with Amarillo VAMC. On December 3, the Union filed its initial demand to bargain with Amarillo VAMC regarding management's implementation of mandatory overtime. A16. On December 11, the Nurse Executive declined to bargain on the basis that the Union's demand "involve[d] direct patient care and competency matters" under 38 U.S.C. § 7422(b). A17. On December 13, the Union filed a second demand to bargain, which explained that the Union was "exercising its right to negotiate the *procedures* Management will use in implementing mandatory overtime for Nurses and to negotiate the *appropriate arrangements* for employees who will be adversely affected." A18. Attached to the demand was a list of eleven "proposals for negotiation." A19–20. The Union requested, among other things, that management provide compensation to nurses who report for overtime shifts but are no longer needed (proposal 3), consider "other options" prior to mandating overtime (proposal 4), allow for voluntary shift substitutions among nurses (proposal 5), balance the "personal needs" of staff with patient care demands (proposal 6), grant employees

---

[1] Certain nurses at Amarillo VAMC were classified as "hybrid" employees, who are not subject to § 7422. *See* A5 n.3; *U.S. Dep't of Veterans Affairs v. Fed. Labor Relations Auth.*, 9 F.3d 123, 125–26 (D.C. Cir. 1993) (defining "hybrid" and "nonhybrid" classifications). These nurses were represented by another union that is not a party to the instant action. *See* Pl.'s Mem. Supp. Mot. Summ. J. 9.

exemptions from mandatory overtime under certain conditions (proposal 7), maintain accurate

records of all overtime worked (proposal 9), and provide at least two days' advance notice for

scheduled mandatory overtime (proposal 10).[2]

---

[2] The Union's initial proposals were as follows:

1. Prior to scheduling Mandatory OT, Management will ensure that employees receive OT in accordance with applicable laws and regulations, such as those listed in 38 U.S.C. 7453.

2. At no time will employees be required to accept Compensatory time in lieu of OT unless the Employee request [sic] Compensatory time and this request must be in writing.

3. According to 38 U.S.C. 7453, [if] [a]n RN who is required to work OT, arrives on station for the scheduled tour of duty and then is not needed and sent home, this RN will receive no less than 2 hours OT pay.

4. Prior to mandating OT, when there is a need for additional staff due to insufficient staffing levels, Management must consider other options.  The Union requests that Management solicit available RNs and allow those willing to work the tour to do so before mandating OT.  This can be done well in advance of each pay period.  It will be understood by the employee that once this time has been scheduled it is part of their tour and they will be held to their commitment to fill this duty time.

5. Management will relieve an employee, upon request, from an overtime assignment if another qualified employee is available for assignment and willing to work[.]

6. When OT is necessary, Management will consider the individual needs of the employee, taking into account child care, elderly care, illnesses, travel distance and amount of time already worked by the employee.  Management will balance the employee's personal needs and the needs of patient care in assigning OT.

7. An employee shall not be required to work overtime under the following conditions:
   A. When unable to work for medical reasons, continuing or prolonged medical conditions will be certified in writing.
   B. If the employee has a justifiable emergency or unavoidable personal situation.

On December 18, the Union submitted a third demand to bargain, which emphasized that "[t]his matter *is* appropriate for negotiations" and that the Union sought only "to negotiate the impact and implementation" of mandatory overtime, rather than to "interfere with the Agency's right" to implement mandatory overtime. A21–22. Attached to this third demand was a revised list of ten proposals largely consistent with the previous list; the Union made non-substantive changes to certain proposals and combined proposals 6 and 7. A22–23; *see also* A7 n.5 (summarizing changes).

On December 20, the Medical Center management met with the Union to discuss its proposals. A13. Management orally agreed to all proposals except for one, but the parties did not memorialize their agreement in writing or decide when any changes would take effect. *See*

---

8. Employees will not perform work outside of their established work station when in OT status. When an RN is scheduled to work OT it will be in his/her normal work station. If an RN is needed for other stations, he or she will be pulled from the normal schedule.

9. OT will be administered in a fair and balanced manner. Records will be kept of those working OT. An RN, once mandated to work OT will be placed on a list and not considered for OT again until others have fulfilled the duty of OT. A copy of these records will be supplied to the Union immediately and on a weekly basis for the duration of the period for which mandatory overtime is required of employees.

10. The Employer will provide employees at least two days advance notice of scheduled overtime to permit employees to readjust personal commitments.

11. Management agrees that mandatory OT will not become the norm but used [sic] only in emergent case [sic] where patient care needs are paramount. Once staffing is adequate the mandatory OT will cease.

A19–20.

*id.* Following the meeting, management continued to move forward with implementing

mandatory overtime. *See id.*

In January 2013, the Union filed an unfair labor practice charge with the FLRA alleging

that Amarillo VAMC's failure to engage in collective bargaining violated 5 U.S.C. § 7116(a).[3]

*See* A24.  In July 2013, the FLRA issued a complaint and notice of hearing, alleging that

Amarillo VAMC's refusal to bargain on December 11 over the Union's various proposals

constituted an unfair labor practice under 5 U.S.C. § 7116(a)(1) and (a)(5).  A63–65.

Subsequently, Amarillo VAMC sent a memorandum to the Secretary of Veterans Affairs

seeking a determination as to whether § 7422 excluded the Union's proposals from the VA's

collective bargaining obligation. *See* A12–15.  The Union filed a response asking the Secretary

to deny Amarillo VAMC's request and to allow the FLRA to pursue the complaint. *See* A67–71.

In January 2014, the Secretary issued a decision finding that the Union's demands to

bargain were excluded from collective bargaining under § 7422(b) ("§ 7422 Decision"). *See*

A4–11.  The § 7422 Decision based its analysis on a decision document approved in 2010 by VA

officials ("2010 Decision Document"), which the Secretary read for the proposition that where a

matter falls within a § 7422 exclusion, any demands to bargain about *procedures* related to that

matter are also excluded. *See* A8–9; *see also* A74–77 (2010 Decision Document).  Applying this

rule, the Secretary then concluded that because the mandatory overtime requirement was

excluded from collective bargaining under § 7422 as related to "direct patient care," and because

the Union's proposals pertained to procedures related to the mandatory overtime, the Union's

---

[3] Although the initial unfair labor practice charge alleged that Amarillo VAMC violated 5
U.S.C. § 7116(a)(1), (a)(3), and (a)(5), the Union filed an amended charge in June 2013 that
removed subsection (a)(3) as a basis for its charge. *See* A24–25.

demands were necessarily excluded as well.  *See* A9–10.[4]  In light of the § 7422 Decision, the

FLRA dismissed the unfair labor practice charge for lack of jurisdiction.  *See* Compl. ¶ 43.[5]

In June 2014, the Union brought this action against the Acting Secretary of Veterans

Affairs under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See* Compl., ECF No.

1.  The two-count complaint alleges that the § 7422 Decision exceeded the Secretary's statutory

authority in violation of 5 U.S.C. § 706(2)(C), and that it was arbitrary and capricious under 5

U.S.C. § 706(2)(A).  *See id.* ¶¶ 44–54 (Count I), ¶¶ 55–71 (Count II).  By way of relief, the

Union asks the Court to vacate the § 7422 Decision, to order the VA to engage in collective

bargaining with the Union, and to order the FLRA to reinstate the Union's unfair labor practice

charge.  *See id.* ¶¶ 72–75.

The parties have filed cross-motions for summary judgment.  *See* ECF Nos. 10, 12.  Both

motions are now fully briefed.

## III.  LEGAL STANDARD

Typically, a court may grant summary judgment when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  But when assessing a summary judgment motion in an APA case,

"the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d

1077, 1083 (D.C. Cir. 2001).  "The entire case on review is a question of law, and only a

---

[4] Although some of the Union's proposals arguably related to compensation, the § 7422 Decision invoked only the "direct patient care" exclusion.

[5] The administrative record does not appear to contain any record of the FLRA's dismissal for lack of jurisdiction, which the Union alleges in its complaint.  Because this fact is not material to the Court's analysis and because it is not disputed, the Court will assume it to be true.  *See AFGE Local 446*, 475 F.3d at 352 ("[T]he collective bargaining exclusions in § 7422(b) are jurisdictional . . . .").

question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). "In such a case, summary judgment merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011). "Moreover, the party challenging an agency's action as arbitrary and capricious bears the burden of proof." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc).

## IV.  ANALYSIS

The Union alleges that the § 7422 Decision is arbitrary and capricious and exceeds the Secretary's statutory authority, in violation of the APA's requirements.  *See* Compl. ¶¶ 44–71. Upon review of the administrative record and applicable authorities, the Court concludes that because the § 7422 Decision fails to reflect "reasoned decisionmaking," it is arbitrary and capricious and deserving of no deference.  Accordingly, the Court grants the Union's motion for summary judgment, vacates the § 7422 Decision, and remands to the Acting Secretary for further consideration.

### A.  Reasonableness of the § 7422 Decision

Judicial review of a § 7422 decision under the APA is governed by the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  *See AFGE Local 446*, 475 F.3d at 344.  At step one, a court must ask "whether Congress has directly spoken to the precise question at issue."  *Id.* at 345 (quoting *Chevron*, 467 U.S. at 842).  That is, the court must determine "whether § 7422 is ambiguous as to the VA's authority to interpret the statute to exclude the [u]nion's grievance from the collective bargaining process."  *Id.*  If § 7422 is ambiguous in this respect, at step two, the court must "defer to the

VA's interpretation . . . if that interpretation is 'based on a permissible construction of the statute,' that is, if the interpretation is reasonable." *Id.* at 346 (quoting *Chevron*, 467 U.S. at 843).[6]

### 1. *Chevron* Step One

"At step one, to determine whether Congress has directly spoken to the precise question at issue, [courts must] use 'the traditional tools of statutory interpretation.'" *Council for Urological Interests v. Burwell*, 790 F.3d 212, 219 (D.C. Cir. 2015) (quoting *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003) (internal quotation marks omitted)). Statutory interpretation proceeds from "the plain language of the statute in question." *Id.* (quoting *Citizens Coal Council v. Norton*, 330 F.3d 478, 482 (D.C. Cir. 2003)). Even where the text is ambiguous, "a statute may foreclose an agency's preferred interpretation . . . if its structure, legislative history, or purpose makes clear what its text leaves opaque." *Id.* at 221 (quoting *Catawba Cnty. N.C. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009)).

Step one of *Chevron* cannot resolve this case. Section 7422 excludes from the collective bargaining obligation "any matter or question concerning or arising out of . . . professional conduct or competence," 38 U.S.C. § 7422(b), and further defines "professional conduct or competence" to encompass "[d]irect patient care," *id.* § 7422(c)(1). Here, Amarillo VAMC's

---

[6] The Union proffers two reasons why *Chevron* is inapplicable, both of which the Court rejects. First, the Union attempts to distinguish the D.C. Circuit's application of *Chevron* in *AFGE Local 446* on the basis that that case concerned the "employee compensation" exclusion under § 7422(b)(3), rather than the § 7422(b)(1) exclusion for "professional conduct or competence" at issue here. *See* Pl.'s Mem. Supp. Mot. Summ. J. 17. But the Union offers no support for such a cramped reading of *AFGE Local 446*. The Union also contends that the § 7422 Decision warrants no deference because it was "developed in reaction to litigation." *See id.* But many, if not all, § 7422 decisions would be responses to "litigation" under the Union's sweeping understanding of that term, and it is settled law that *Chevron* applies to review of § 7422 decisions. *See AFGE Local 446*, 475 F.3d at 353–55. The prohibition on according deference to agency lawyers' arguments, however, does come into play later in the Court's analysis. *See infra* Part IV.A.2.

imposition of mandatory overtime to remedy staffing shortages is arguably a matter implicating "direct patient care," but as the Union's arguments suggest, the connection to "professional conduct or competence" is more tenuous. *See* Pl.'s Mem. Supp. Mot. Summ. J. 11–13. Even if the mandatory overtime itself falls within a § 7422 exclusion, the statute's "plain language" says nothing about whether the *procedures* for implementing such overtime—the subject of the Union's proposals—is also excludable. *Council for Urological Interests*, 790 F.3d at 219. Nor does the Court find helpful the legislative history cited by the Union; those floor statements only reinforce the principle evident from the plain text that "direct patient care" is excludable from collective bargaining, without elaborating on how that phrase should be applied in a case such as this one. *See, e.g.*, 137 Cong. Rec. S4,544 (Apr. 17, 1991) (statement of Sen. Cranston) ("The exclusion . . . of matters concerning professional conduct or competence is designed to be limited to those matters that involve the manner in which health care is provided [and] relates only to matters involving direct patient care and clinical competence.").[7]

Both the Union and the VA incorrectly assert that the Court can end its analysis at step one. The VA argues that Congress has "directly spoken" to the issue at hand because § 7422(d) "plainly authorizes the VA Secretary to determine" whether an issue falls within an enumerated exclusion from collective bargaining. Def.'s Opp'n & Cross-Mot. Summ. J. 11. But the VA misunderstands *Chevron*: Step one asks "not whether the VA is authorized to decide disputes over the scope of a collective bargaining exclusion—it is—but whether § 7422 is ambiguous as

---

[7] In reply, the VA suggests that legislative history has no place in a *Chevron* analysis because it is less authoritative than an agency's statutory interpretation. *See* Def.'s Reply 16. But in the D.C. Circuit, courts can look to legislative history at step one of *Chevron*. *Council for Urological Interests*, 790 F.3d at 221. *But see I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 454 (1987) (Scalia, J., concurring) (reasoning that requiring courts to exhaust "traditional tools of statutory construction," including legislative history, renders *Chevron* deference a "doctrine of desperation").

to the VA's authority to interpret the statute *to exclude the Union's grievance* from the collective bargaining process." *AFGE Local 446*, 475 F.3d at 345 (emphasis added).[8]  For its part, the Union contends that when the VA excludes a matter from collective bargaining on the basis of "direct patient care" under § 7422(c), the VA must separately find that that matter is related to "professional conduct or competence" under § 7422(b), given that the former phrase is a definition of the latter.  *See* Pl.'s Reply & Opp'n 3–4.  Here, because the § 7422 Decision was based only on the exigencies of "direct patient care" and did not discuss "professional conduct or competence," in the Union's view, the § 7422 Decision fails at *Chevron* step one.  *See* Pl.'s Reply & Opp'n 4.  But here again, Congress has not "directly spoken to the precise question at issue" because § 7422 does not require any particular analytical framework, let alone the dual inquiry proposed by the Union.  *Council for Urological Interests*, 790 F.3d at 219.

Because Congress has not "directly spoken" in § 7422 to the question of whether the VA had authority to exclude the Union's proposals regarding mandatory overtime procedures from the collective bargaining process, *Chevron*, 467 U.S. at 842, the Court must "dance on" to step two, *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005).

### 2.  *Chevron* Step Two

At step two, the court must defer to the agency so long as it has adopted an "interpretation [that] is 'based on a permissible construction of the statute,' that is, if the interpretation is reasonable." *AFGE Local 446*, 475 F.3d at 355 (quoting *Chevron*, 467 U.S. at

---

[8] Section 7422(d) serves only to expressly delegate to the Secretary the authority to render § 7422 decisions, such that the *Chevron* framework applies.  *See Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) ("If 'Congress has not directly addressed the precise question at issue,' and the agency has acted pursuant to *an express or implied delegation of authority*, the agency's statutory interpretation is entitled to deference, as long as it is reasonable." (quoting *Chevron*, 467 U.S. at 843–44) (emphasis added)).  Indeed, the Union does not dispute that "the Secretary is empowered to make § 7422 determinations" by virtue of § 7422(d).  Pl.'s Reply & Opp'n 3.

843); *see also Northpoint Tech.*, 412 F.3d at 151 ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made . . . ." (quoting *Chevron*, 467 U.S. at 863)).  In a challenge to a VA § 7422 decision, the court's "inquiry under *Chevron* step two overlaps with [its] inquiry under the arbitrary and capricious standard." *AFGE Local 446*, 475 F.3d at 355.  To satisfy this standard, the agency must engage in "reasoned decisionmaking." *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (reviewing agency orders).

     Reasoned decisionmaking requires not only that "an agency's decreed result be within the scope of its lawful authority," but also that "the process by which it reaches that result . . . be logical and rational." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998). "Reasoned decisionmaking, in which the rule announced is the rule applied, promotes sound results, and unreasoned decisionmaking the opposite." *Id.* at 375.  In determining whether an agency's decisionmaking passes muster, courts can consider only "what the agency said" in explaining its conclusions, not "its lawyers' post-hoc rationalizations." *Council for Urological Interests*, 790 F.3d at 222 (reviewing rulemaking); *see also Williams Gas Processing*, 475 F.3d at 326 ("It is axiomatic that we may uphold agency orders based only on reasoning that is fairly stated by the agency *in the order under review* . . . ." (emphasis added) (citation omitted)).

     On the other hand, the reviewing court need not find that the agency has adopted "the best possible reading" or "the only permissible interpretation" of a statute—only that the agency's reading is "reasonable." *AFGE Local 446*, 475 F.3d at 355.  Nor must an agency's decision be "a model of analytic precision." *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) (citations omitted).  Rather, the court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (citation omitted).

Here, the reasoning of the § 7422 Decision under review hinges on the Secretary's

statement of the applicable decisional rule, which he claims to derive from the preamble to the

2010 Decision Document:

> [I]t is important to recognize that [the Union] characterized its
> proposals concerning mandatory overtime . . . as arrangements and
> procedures, or alternatively, proposals concerning the impact and
> implementation of mandatory overtime for full title 38 registered
> nurses.  In the Secretary's [2010] Decision Document, the
> preamble unequivocally states: "*Nothing in this [decision
> document] means 7422 is being expanded to appropriate
> arrangements and procedures (impact and implementation).*"
> Thus, the primary question to resolve here is whether the Medical
> Center's three-pay period mandatory overtime requirement falls
> within one of the 38 U.S.C. § 7422 exclusions.  If it does, then
> impact and implementation proposals (i.e., procedures) that relate
> to and address the excluded matter also fall within the scope of the
> exclusion and are outside the Medical Center's duty to bargain.

A8–9 (emphasis added) (internal citations omitted).  In the Secretary's view, then, the 2010

Decision Document's preamble established an "unequivoca[l]," categorical rule: If an issue falls

within a § 7422 exclusion, then any demands to bargain about *procedures* "that relate to and

address" that issue must also be excluded.  *Id.*  After finding that the subject of mandatory

overtime was excluded under § 7422 as related to direct patient care, the Secretary then

concluded that "[t]herefore, *as set forth in the preamble to the Secretary's* [2010] *Decision

Document*, [the Union]'s impact and implementation proposals concerning the mandatory

overtime requirement similarly arise out of direct patient care under 38 U.S.C. § 7422(b)(1)."

A9–10 (emphasis added).

Fatal to the § 7422 Decision's analysis, however, is the fact that the categorical rule it

purports to draw from the 2010 Decision Document preamble is nowhere to be found in that

document.  The relevant paragraphs in the 2010 Decision Document preamble provide:

The parties recognize that under 7422, issues involving direct patient care, clinical competence, peer review, and establishment, determination, or adjustment of compensation for health care workers are not subject to negotiation with labor unions, nor can such matters be grieved under negotiated grievance procedures.

The parties also recognize proposals for procedures that are peripheral (i.e. related but not substantively) to an exempted issue may not be subject to the exemptions; the particulars of a given proposal determine whether it falls inside a 7422 exemptions [sic]. *Nothing in this means 7422 is being expanded to appropriate arrangements and procedures (impact and implementation).*

It is the Department's desire to work with its labor partners to eliminate even the appearance of bias or inappropriate use of the 38 U.S.C. § 7422 exclusions.

A74 (emphasis added).

Although the Secretary interpreted the sentence in the 2010 Decision Document preamble italicized above as limiting the VA's collective bargaining duty, that sentence does precisely the opposite—it emphasizes limits on the § 7422 *exclusions* from that duty. The Secretary's reading of the sentence fails before it even leaves the gate because it renders the modifier "appropriate" nonsensical: Why would section "7422" foreclose collective bargaining over wholly "appropriate" matters? *Id.* Context further undermines the Secretary's reading. In the sentences immediately before and after the sentence quoted by the Secretary, "7422" modifies the words "exemptions" or "exclusions." *Id.*[9] Moreover, any notion that the sentence quoted by the Secretary excludes all bargaining over procedures cannot be squared with the first clause of the immediately preceding sentence: "The parties also recognize proposals for procedures that are peripheral (i.e. related but not substantively) to an exempted issue *may not be subject to the exemptions . . . .*" *Id.* (emphasis added). Similarly, Section C.3 of the 2010 Decision Document

---

[9] Additionally, the collective bargaining duty emanates not from § 7422, but from "chapter 71 of title 5" of the United States Code, as § 7422 itself provides. 38 U.S.C. § 7422(a).

affirms that "*procedures* for the development of voluntary and mandatory rosters for overtime are negotiable." A77 (emphasis added).  At bottom, nothing in the 2010 Decision Document can be reasonably read to support the § 7422 Decision's categorical rule that procedures related to substantive issues falling within the § 7422 exclusions are necessarily also excluded from the collective bargaining duty.

Indeed, rather than categorically excluding procedural matters, the 2010 Decision Document mandates a fact-specific, case-by-case approach: "[T]he particulars of a given proposal determine whether it falls inside a 7422 exemptions [sic]." A74.  The § 7422 Decision at issue here, of course, does not examine the "particulars" of any of the Union's proposals.[10] Thus, "the rule announced" in the § 7422 Decision—the 2010 Decision Document preamble— was not "the rule applied." *Allentown Mack Sales & Serv.*, 522 U.S. at 375.  Alternatively, in terms arguably more faithful (but no more charitable) to the § 7422 Decision's misstep, although the Secretary "announced" and "applied" a rule excluding from collective bargaining any procedures related to a matter of direct patient care, that rule has no basis in the only authority upon which the Secretary purported to rely.[11]  Either way, the § 7422 Decision's reasoning

---

[10] The Union contends that the Secretary's failure to discuss individual proposals, standing alone, requires vacatur because § 7422—independent of the 2010 Decision Document—"requires the Secretary to address specific proposals when determining whether bargaining is exempted." Pl.'s Mem. Supp. Mot. Summ. J. 16.  The Court need not pass on this argument given that it concludes on other grounds that the § 7422 Decision lacks reasoned decisionmaking.

[11] Footnote 6 of the § 7422 Decision, which is appended to the paragraph deriving the decisional rule, explains that "[t]his issue was addressed in VAMC Northern California" and quotes several sentences from the § 7422 decision in that case. A9 n.6.  Like this case, the Northern California case involved a demand to bargain over procedures related to a substantively excluded issue.  Although the Secretary there relied in part on the same misreading of the 2010 Decision Document preamble, that decision (in portions quoted in footnote 6 of the § 7422 Decision) also mentioned "the expansive nature of the language in 38 U.S.C. § 7422(b)" and reasoned that "[w]hen an issue . . . is determined to be a matter excluded by application of 38 U.S.C. § 7422, any proposals concerning or arising out of the excluded matter are similarly

"process" is anything but "logical and rational." *Id.* at 374.  The Court accordingly vacates the §

7422 Decision, not because it is less than a "model of analytic precision," but because the VA's

analytical "path" cannot "reasonably be discerned." *Coburn*, 679 F.3d at 934.[12]

   The VA's attorneys attempt to save the § 7422 Decision by explaining that § 7422

authorizes the agency to refuse to engage in collective bargaining whenever an emergency

situation implicating direct patient care arises. *See* Def.'s Opp'n & Cross-Mot. Summ. J. 2, 17,

21.[13]  But nowhere does the § 7422 Decision invoke any such emergency situation rule, and

"lawyers' post-hoc rationalizations" have no place in the Court's review under the APA.

*Council for Urological Interests*, 790 F.3d at 222.  Indeed, the staffing shortage here did not

render Amarillo VAMC unable to meet with and informally agree with the Union on the

majority of its proposals or to bargain with another union representing employees not subject to

---

excluded from bargaining."  A88.  But the Court need not examine the Northern California case
further because the § 7422 Decision under review expressly relies only on the 2010 Decision
Document.  *See* A9–10 (reaching conclusion on the basis of rule purportedly "set forth in the
preamble to the Secretary's [2010] Decision Document"); *see also Williams Gas Processing*, 475
F.3d at 326 (explaining that judicial review is limited to "reasoning that is fairly stated by the
agency in the order under review" (citation omitted)).  Alternatively, even if footnote 6 were
construed to suggest reliance on the Northern California case, the rule of that case plainly
conflicts with the 2010 Decision Document preamble, upon which the § 7422 Decision also
professes to be based.  *See Williams Gas Processing*, 475 F.3d at 328–29 ("Arbitrary and
capricious review strictly prohibits us from upholding agency action based only on our best
guess as to what reasoning truly motivated it.").

   [12] In its response to Amarillo VAMC's request for a § 7422 determination, the Union
argued that the 2010 Decision Document could not support Amarillo VAMC's position.  *See*
A69–70.  In its motion for summary judgment and in its reply and opposition, the Union
contends that the Secretary's "disregarding" of the 2010 Decision Document is not "reasoned
agency decision making."  Pl.'s Mem. Supp. Mot. Summ. J. 17; *see also* Pl.'s Reply & Opp'n
12–13.  The VA does not argue that the Union has waived its arguments based on the 2010
Decision Document—or any other argument, for that matter.  *See Village of Barrington, Ill. v.
Surface Transp. Bd.*, 636 F.3d 650, 667 (D.C. Cir. 2011) (finding challenge to agency action
waived for failure to assert "during the administrative process").

   [13] Borrowing from First Amendment law, the Union characterizes the VA attorneys'
theory as a "time, place, and manner" restriction on the collective bargaining duty.  *See* Pl.'s
Reply & Opp'n 13.

§ 7422.  *See* A5 n.3; A13.  Furthermore, the VA attorneys' theory conflicts with the Secretary's

reasoning in the § 7422 Decision.  The § 7422 Decision excludes from collective bargaining only

those procedures "that relate to and address" a substantively excluded issue.  A9.  In pressing

their new emergency situation rule, however, the VA attorneys favor a broader exclusion,

arguing that whenever "direct patient care" exigencies arise, § 7422 allows the VA to relieve

itself of the burden of having to bargain over proposals that "in part deal with non-direct patient

care matters," that are "tangential" and "have little directly to do with" patient care, and that are

"extraneous to [the] assessment of the actual direct patient care conditions."  Def.'s Opp'n &

Cross-Mot. Summ. J. 20–21.[14]

To be clear, the Court does not hold that the VA may not, as a matter of law, exclude the

Union's proposals on overtime procedures from collective bargaining under § 7422.  Nor does

the Court express any opinion on whether the VA attorneys' emergency situation rule is a

"permissible" application of the § 7422 exclusions.  On remand, the Acting Secretary will be free

to articulate his preferred decisional rule, drawing upon the text of §7422, the 2010 Decision

Document, relevant precedents, or applicable policy arguments, among other sources.  *See*

*Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 666 (D.C. Cir. 2011) ("[W]hen

an agency interprets ambiguities in its organic statute, it is entirely appropriate for that agency to

consider . . . policy arguments that are rationally related to the statute's goals." (alteration,

citation, and internal quotation marks omitted)).

The Court also notes that the 2010 Decision Document is central to the Court's analysis

today only because the VA opted to rely on it as the sole basis for the § 7422 Decision.  The

---

[14] In reply, the VA appears to backpedal: "Here, of course, measures to address the
serious staffing shortages . . . had a far greater than 'tangential' link to direct patient care . . . ."
Def.'s Reply 5.

question presented in this case is, after all, whether the VA's interpretation *of § 7422*—not the 2010 Decision Document—is permissible.  Additionally, the Court need not decide today whether the 2010 Decision Document constitutes agency policy or precedent or whether the Acting Secretary on remand *must* engage with its provisions.  *Cf. Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) ("We have held that '[r]easoned decision making . . . necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent' . . . ." (citation omitted)); *Williams Gas Processing*, 475 F.3d at 329 ("If [agency] intended to adopt a new policy . . . , [it] was obliged to explain that extension of its case law . . . .").  The Court holds only that the VA does not engage in "reasoned decisionmaking" about the scope of the § 7422 "direct patient care" exclusion when it purports to rely on an authority but fails to comprehend or fairly apply that authority.  *See Allentown Mack Sales & Serv.*, 522 U.S. at 374.[15]

In closing, however, the Court expresses its reservations about overly broad constructions of "direct patient care."  The purpose of the Department of Veterans Affairs Labor Relations Improvement Act of 1991 was to provide VA healthcare professionals with collective bargaining rights.  *See* 137 Cong. Rec. S4,542–44 (Apr. 17, 1991) (statement of Sen. Cranston).  Against the backdrop of this general rule, the Act created certain exceptions, including one for "direct patient care."  But because almost everything a nurse does touches on "direct patient care," construing that phrase to encompass even matters that are peripheral to that issue (or procedural proposals)

---

[15] The parties also dispute whether the § 7422 Decision is consistent with certain provisions in the parties' collective bargaining agreement ("CBA").  *See* Pl.'s Mem. Supp. Mot. Summ. J. 10–11, 20–22; Def.'s Opp'n & Cross-Mot. Summ. J. 14–18.  The § 7422 Decision found that the CBA did not mandate bargaining over the procedural proposals at issue because a clause in the CBA specified that its provisions would yield to the § 7422 exclusions.  A10. Because the Court finds the § 7422 Decision's analysis of the § 7422 exclusions to be inadequately reasoned, the Court need not consider the § 7422 Decision's discussion of the CBA.

risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself.  If any proposals touching on how nurses do their job would be excluded from collective bargaining, then what would be left for unions and the VA to bargain over?  The 2010 Decision Document appears to recognize this danger and suggests that a careful, fact-specific balancing of interests is necessary for the proper application of the § 7422 exclusions.

Because the § 7422 Decision fails to engage in the "reasoned decisionmaking" that is necessary to render its construction of the § 7422 exclusions "permissible" or "reasonable," the Court cannot defer to the § 7422 Decision and concludes that it constitutes arbitrary and capricious agency action.  And because the Court's "inquiry under *Chevron* step two overlaps with [its] inquiry under the arbitrary and capricious standard," *AFGE Local 446*, 475 F.3d at 355, the Court also finds under the *Chevron* framework that the Secretary exceeded his statutory authority in applying the "direct patient care" exclusion to the Union's proposals.  Accordingly, the Court grants summary judgment to the Union on both Counts I and II.[16]

**B.  Remedy**

Having concluded that the § 7422 Decision cannot withstand the Union's challenges under the APA, the Court now determines the proper remedy.  The Union urges the Court to vacate the § 7422 Decision, to order the VA to engage in collective bargaining with the Union, and to order the FLRA to reinstate the Union's unfair labor practice charge.  *See* Compl. ¶¶ 72–75.  Although the Court vacates the § 7422 Decision in light of the foregoing analysis, it declines at this juncture to order the Union's other requested relief.  Instead, the Court remands this case

---

[16] The VA does not argue that, in the alternative, if the § 7422 Decision does not warrant deference under *Chevron*, it nonetheless deserves some lesser measure of deference.  Even if the VA had advanced such an argument, the Court would conclude that the lack of reasoned decisionmaking in the § 7422 Decision renders it wholly unpersuasive under any standard.  *See Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012) ("[F]ollowing *Skidmore*, we find that the [agency] letter's persuasive power is virtually nil.").

to the Acting Secretary of Veterans Affairs for further consideration consistent with this

Memorandum Opinion.  *See Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012) ("pursu[ing] a

course of prudence" in remanding to the district court with instructions to remand to the agency,

rather than ordering full relief requested by the plaintiff); *accord Innovator Enters., Inc. v. Jones*,

28 F. Supp. 3d 14, 30 (D.D.C. 2014) (declining to enter declaratory judgment and remanding to

agency for further consideration).

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 10) is

**GRANTED**, and Defendant's cross-motion for summary judgment (ECF No. 12) is **DENIED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 8, 2015                                         RUDOLPH CONTRERAS
                                                                 United States District Judge